FILED

2023 May-27  PM 02:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MARINA STEWART-MAGEE**, *as Administrator and Personal Representative of the Estate of Albina Agdasovna Sharifullina, Deceased* | } } } } } | |
| **Plaintiff,** | } } | **Case No.: 5:22-cv-00010-MHH** |
| **v.** | } } | |
| **DANIEL B. SNYDER,** | } } | |
| **Defendant.** | | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case concerns an accident involving a Sea-Doo personal watercraft. While Albina Agdasovna Sharifullina and Daniel B. Snyder were traveling on the Sea-Doo, they struck a dock. Mr. Snyder was injured, and Ms. Sharifullina died in the accident. (Doc. 21). Among other things, the jury in this case must decide who was driving the Sea-Doo at the time of the accident. To carry her burden of proving that Mr. Snyder was operating the Sea-Doo, Marina Stewart-Magee, the administrator of Ms. Sharifullina's estate, relies on an investigation conducted by a marine police officer, Agent John Williams. Agent Williams has opined that Mr. Snyder was driving the Sea-Doo at the time of the accident.

Mr. Snyder has asked the Court to exclude Agent Williams's opinions at trial.

(Doc. 13).  Mr. Snyder argues that Agent Williams is not qualified to express the opinions that he offers in this case and that the methodology Agent Williams used to reach his opinions is unreliable.  This opinion resolves Mr. Snyder's motion to exclude Agent Williams's expert testimony.

### Rule 702 Standard for Admissibility of Expert Opinions

Under Federal Rule of Evidence 702, an expert may be qualified "by knowledge, skill, experience, training, or education," and an expert may testify at trial and offer an expert opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Eleventh Circuit Court of Appeals requires district courts to apply a "rigorous three-part inquiry" when considering the admissibility of expert testimony under Rule 702.  A district court must determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*) (quoting

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)).

All three prongs "are distinct concepts that courts and litigants must take care not to

conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341

(11th Cir. 2003). The party offering expert testimony must demonstrate that the

anticipated testimony is admissible under Rule 702. *Frazier*, 387 F.3d at 1260.

Agent Williams's opinions concern his investigation and reconstruction of the

accident. (Doc. 13-5, p. 6, ¶ 17); (Doc. 17, pp. 5–14). The Court, exercising its

gatekeeping function under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993), first considers Agent Williams's qualifications and then examines the

sufficiency of Agent Williams's data and the reliability of the methods he used to

reach his opinions in this case.[1]

### Agent Williams's Qualifications

Under Rule 702, "[w]hile scientific training or education may provide

possible means to qualify, experience in a field may offer another path to expert

status." *Frazier*, 387 F.3d at 1260–61. The standard for admissibility under the

qualifications prong is not stringent. *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578

---

[1] At the February 15, 2023, *Daubert* hearing in this case, the Court held that Agent Williams's testimony about the cause of the bruising on Ms. Sharifullina's body is inadmissible under Rule 702 "because the only thing Agent Williams could say was that there were different possibilities about what may have caused the injuries and the bruising . . . ." (Doc. 54, pp. 165–66). Agent Williams did not explain why one possibility was more likely than another, and he did not rule out possibilities that were unlikely. *See* discussion below. An opinion about different possibilities that may have caused injuries and bruising will not help jurors resolve a disputed question of fact in this case.

(N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010) (citation omitted). "[S]o long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility." *Hendrix*, 255 F.R.D. at 578 (citation omitted).

Agent Williams's qualifications are these: he graduated from the Northeast Alabama Law Enforcement Academy at Jacksonville State University in 2008, where he completed 480 hours of basic training to become a law enforcement officer. (Doc. 13-5, p. 2, ¶ 3); (Doc. 54, pp. 33–37). After graduating from the law enforcement academy, Agent Williams completed a 10-week Marine Patrol School in Orange Beach, Alabama. (Doc. 13-5, p. 2, ¶ 3); (Doc. 54, pp. 33, 125–26). From 2008 through 2015, Agent Williams served as a marine police officer for the Department of Conservation & Natural Resources. (Doc. 13-5, p. 2, ¶ 4); (Doc. 54, p. 31). In 2015, Agent Williams became a senior trooper for the Marine Patrol Division of the Alabama Law Enforcement Agency. (Doc. 13-5, p. 2, ¶ 2). In 2018 and 2019, Agent Williams completed a level one Comprehensive Boating Incident Investigation course and a level two Boating Incident Reconstruction and Analysis course, both offered by the National Association of State Boating Law Administrators. (Doc. 54, pp. 41–43, 126, 144); (Doc. 13-5, p. 3, ¶ 5).

According to Agent Williams, he has experience and specialized training in boating accident investigation and reconstruction.  He has investigated more than 60 boating and personal watercraft accidents, including accidents involving fatalities. Agent Williams asserts that he has investigated cases to determine who was driving a personal watercraft at the time of an accident.  (Doc. 13-5, p. 3, ¶¶ 5–6); (Doc. 17-2, p. 9, tp. 32).

In his deposition, Agent Williams testified that during investigations, he reconstructs accidents.  (Doc. 17-2, p. 34, tpp. 130–31).  During his time in Marine Patrol School, Agent Williams learned to reconstruct accidents using measurements, photographs, and other evidence.  (Doc. 17-2, p. 8, tp. 28).  From 2016 through 2018, Agent Williams taught accident investigation and reconstruction to recruits at the Marine Patrol School.  (Doc. 54, p. 45).

During Marine Patrol School, Agent Williams learned what the "marine environment . . . does to a person when they are ejected through boats and docks and land and water."  (Doc. 17-2, p. 8, tp. 28).  Agent Williams states that he has "knowledge of the type of injuries, bruising and/or markings consistent with and sustained to the bodies of individuals who are involved in a PWC collision and more specifically, who are seated in the front/driver's seat of a PWC at the time of impact." (Doc. 13-5, p. 3); (Doc. 17-2, p. 9, tpp. 29–30).  According to Agent Williams, he has experience observing injuries and markings on a person's body to determine the

cause of the injuries.  (Doc. 17-2, p. 9, tp. 30).

Based on this information, Ms. Stewart-Magee has established that Agent Williams's training and experience in investigating marine accidents and injuries may qualify him as an expert in this case.  For purposes of this opinion, the Court assumes, without deciding, that Agent Williams's training and experience qualify him to render opinions in this case.[2]

### *Reliability of Agent Williams's Methodology*

Experience alone is not sufficient to "render[] reliable *any* conceivable opinion [an] expert may express."  *Frazier*, 387 F.3d at 1261 (emphasis in *Frazier*). "'If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply taking the expert's word for it.'"  *Frazier*, 387 F.3d at 1261 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment) (emphasis in *Frazier*).

---

[2] *Abbott v. Mega Trucking, LLC*, 2023 WL 2640203, at *4 (M.D. Ala. Mar. 24, 2023) (finding expert was qualified to testify about causation and fault where "[a]t the time of the crash, [the expert] had been a state trooper since 2017, had investigated over 100 motor vehicle crash scenes, had been trained on basic crash investigation, and had taken an 80-hour traffic homicide investigation course"); *see also Waters v. AIG Claims, Inc.*, 608 F. Supp. 3d 1120, 1133–34 (M.D. Ala. 2022), *appeal dismissed*, 2023 WL 3375535 (11th Cir. Mar. 24, 2023) ("Accident reconstruction opinions clearly were appropriate for the Shreveport Police Department accident investigator who actually investigated the accident, conducted witness interviews, inspected the scene and vehicles, and reviewed the medical examiner's file.").

To evaluate the reliability of scientific and non-scientific experience based-testimony, courts may consider, "to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (citations omitted); *Frazier*, 387 F.3d at 1262 ("The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony.") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  Also relevant to the reliability inquiry is "'[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'" and "'[w]hether the expert has adequately accounted for obvious alternative explanations.'"  *Frazier*, 387 F.3d at 1297 n.13 (quoting FED. R. EVID. 702 advisory committee's note to 2000 amendment).

The reliability inquiry is flexible, and a court has "considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.  In assessing reliability, a court focuses "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 580.

Agent Williams conducted a "damage pattern analysis" to reach his

conclusions in this case.  (Doc. 54, pp. 55–56).  Agent Williams explained that a damage pattern analysis consists of "survey[ing] the vessel and then the point of impact, the dock, the bodies, the people who are involved, and put[ting] all that together into what happened."  (Doc. 54, p. 56).  Through his investigation of the accident and his observation of Mr. Snyder's injuries, Agent Williams concluded that Mr. Snyder was driving the Sea-Doo at the time of the accident.  (Doc. 17-2, p. 26, tpp. 98–100).[3]

In his deposition, Agent Williams testified that the Sea-Doo hit the dock at a 15-degree angle after the driver of the Sea-Doo made a "sudden" and "evasive" left turn immediately before impact.  (Doc. 17-2, p. 11, tpp. 38–40; p. 19, tp. 69; p. 27, tp. 101); (Doc. 13-5, p. 7, ¶ 17).  The record does not indicate how Agent Williams reached his conclusion that the angle of impact was 15 degrees. (Doc. 17-2, p. 11, tp. 38; p. 28, tp. 105).  Agent Williams concluded that the driver of the Sea-Doo made a sharp left turn before hitting the dock because the Sea-Doo sustained damage on the front, right side.  (Doc. 17-2, pp. 11-12, tpp. 40-41).  Missing from Agent Williams's testimony is data, such as measurements, to support his guesstimate that the angle of impact was 15 degrees.[4]  In the *Daubert* hearing, Agent Williams could

---

[3] There were no witnesses to the late-night accident; there is no direct evidence of the identity of the driver of the SeaDoo.

[4] Agent Williams took very few measurements at the accident scene.  His testimony repeatedly illustrates the vague nature of his analysis.  For example:

not recall the angle of impact, and he could not recall if he did anything to measure the angle.  (Doc. 54, pp. 86-87).  Agent Williams acknowledged that the angle of impact has a bearing on the way in which riders would be thrown from the PWC. (Doc. 54, p. 99).

In Agent Williams's opinion, Mr. Snyder was ejected over the Sea-Doo's steering mechanism and onto the dock, hitting his abdominal area against the Sea-Doo's handlebar along the way.  (Doc. 13-5, p. 7, ¶ 17); (Doc. 17-2, p. 14, tp. 51; p. 19, tp. 69).  When Agent Williams was asked if it is "more likely that someone is going to go over the handlebars in a PWC collision from a head on impact as opposed to an impact that takes place at an angle," Agent Williams answered:

---

> Q: [Do the markings on the Sea-Doo's dock rub rail] indicate to you that the Sea-Doo stayed in contact with the dock for approximately three to four feet?
>
> A: It could.
>
> Q: Could [the Sea-Doo] have stayed in contact with the dock for longer than that?
>
> A: Gravity takes over at some point.

(Doc. 17-2, p. 14, tp. 49).  Agent Williams's testimony describes many possibilities, none of which he tested, even against basic standards of plausibility.  For example, in the *Daubert* hearing, Mr. Snyder's attorney pointed to Ms. Sherafullina's head injury and asked:  "We can agree that she had one head injury, right?"  (Doc. 54, p. 76).  Agent Williams replied:  "Correct."  (Doc. 54, p. 76).  Mr. Snyder's attorney asked:  "And you're saying she hit two objects with her head, a horizontal handrail and a vertical pole, correct?  (Doc. 54, p. 76).  Agent Williams responded: "That's possible."  (Doc. 54, p. 76).  The examination continued:  "[Y]our testimony, just to be clear, is that Ms. Sharifullina hit the horizontal brace because it's bent, right?"  (Doc. 54, p. 76). "Right."  (Doc. 54, p. 76).  "That she hit that first with her head and then she hit the pole . . .?" (Doc. 54, p. 76).  "Correct."  (Doc. 54, p. 76).  "[Y]our opinion is . . . that she hit both the horizontal support and the vertical pole with her head, correct?"  (Doc. 54, p. 76).  "Correct."  (Doc. 54, p. 76).  "[S]o if that opinion is true, then she had to hit her head in the exact same place on both impacts, right?"  (Doc. 54, p. 76).  "It's possible."  (Doc. 54, p. 76).

A.      You could go over the handlebars at an angle as well.

Q.      Would you go -- would you be more likely to go over the handlebars at an angle or head on?

A.      You will be more likely to go head on, but we have got very little degree of angle here.

Q.      Okay. But you also have an evasive turn to the left immediately prior to impact, correct?

A.      That's what we believe.

Q.      Okay. And would that make it less likely that the driver would go over the handlebars due to the turning of the watercraft to the left?

A.      Not necessarily.

(Doc. 17-2, p. 14, tpp. 51–52).  When Mr. Snyder's attorney asked Agent Williams if it was "more likely that on impact the passengers on the Sea-Doo are going to go off to the side as opposed to over the handlebars" due to the leaning caused by the evasive left turn, Agent Williams testified:

A.      Not necessarily.

Q.      When you say not necessarily, can you elaborate on that? When would they go over the handlebars?

A.      Well, you have got forward motion. It is not truly -- they wasn't going forty-five to fifty miles an hour sideways. That is not even – that can't even happen. So we had forward momentum we know for sure.

Q.      You also had momentum, sideways momentum as well, correct?

A.      You did.

Q.      Okay.

A.      But we know forward momentum was greater than sideways momentum.

10

Q.    Is there some kind of scientific formula that you applied to the forward momentum versus the side momentum to determine the angle at which the people on the Sea-Doo came off of it?

A.    According to the evidence gathered here with the Sea-Doo in the pictures.

Q.    All right. I'm asking if you had any kind of scientific, scientific formulas?

A.    No.

Q.    Physics, rules of physics that you are applying to it as far as taking into account the weight of the passengers, the angle of impact, the amount of lean of the Sea-Doo?

A.    I have already -- I have already stated it is approximately fifteen degrees.

Q.    Right. I am saying did you come up with any scientific or mathematical formulas, physics formulas that were applied putting all those factors in to create the most likely way these people would have come off the Sea-Doo?

A.    Newton's Law of Motion.

Q.    But you didn't put in anything for instance speed, weight, angle, amount of lean of the Sea-Doo, weight of the passengers to come up with -- it is just Newton's Law of Motion?

A.    What is your question?

Q.    Did you do that? Did you come up with any kind of scientific formula?

       Mr. LEE:  Newton came up with it.

Q.    Or pattern that you plugged in, figures from this accident?

A.    No.

Q.    That showed how the people on the Sea-Doo likely would have exited the Doo?

A.    No to your first question.

(Doc. 17-2, p. 27, tpp. 102–04).

Agent Williams does not have education, training, or experience in biomechanics or kinetics and did not apply those fields to reach his conclusions. (Doc. 54, pp. 42–43, 106–09).   His testimony that he relied on "the evidence gathered" to reach his conclusions is insufficient.   "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert, and the court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."   *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 2023 WL 2733512, at *8 (11th Cir. Mar. 31, 2023) (internal quotations and citation omitted). For a methodology to be reliable, an expert "must be able to adequately explain how the data he relied on led him to his conclusions."   *MidAmerica C2L Inc.*, 2023 WL 2733512, at *9.

In *Frazier*, testimony from a forensic investigator and former police officer that "it would be expected that some transfer of either hairs or seminal fluid would occur" during a sexual assault was held unreliable.   387 F.3d at 1265.   The Eleventh Circuit noted that when the expert was "questioned specifically about the basis for his opinion, [he] said his opinion was based on his experience, and on various texts in forensic investigation.   However, even after repeated prompting, [the expert] never explained just how his own experience, or the texts he mentioned, supported his 'expectancy' opinion."   *Frazier*, 387 F.3d at 1265.   Further, the expert "identified

only a single investigation he had worked on in which hair evidence was recovered during the investigation of a serial rapist, and could suggest no study that had ever examined the rate of transfer of hair in sexual assault cases." *Frazier*, 387 F.3d at 1265.  The Eleventh Circuit found the expert's opinion "unclear, imprecise and ill-defined" and held that "[w]ithout knowing how frequently hair or seminal fluid is transferred during sexual conduct in similar cases—whether derived from reliable studies or based on some quantification derived from his own experience," neither the district court nor the jury could verify the expert's testimony.  *Frazier*, 387 F.3d at 1265.

As in *Frazier*, Agent Williams's opinions cannot be tested or verified.  Agent Williams did not conduct tests to prove his theory of a 15-degree angle of impact, which he abandoned in the *Daubert* hearing, or to demonstrate that the sudden left turn did not make illogical his opinion that Mr. Snyder, from the driver's position, went straight over the handlebars and onto the deck.  Agent Williams has not identified other cases in which he has reached similar conclusions, and he cannot recall details of cases in which he reconstructed an accident scene.  Agent Williams provides no examples of instances where he has observed the trajectory of an individual falling off a Sea-Doo following a left turn, and he does not explain how his experience and training inform his opinion.

Ms. Stewart-Magee argues that Agent Williams's methodology is reliable

because he followed the investigative standards set out by NASBLA.  (Doc. 50).
The NASBLA standards state that an investigator must "[d]escribe the basic
principles of physics involved in a boat collision which include Newton's laws of
motion (e.g. law of inertia, law of acceleration, and law of action-reaction, etc.) and
kinetic energy (the exchange and dissipation of energy in a collision)."  (Doc. 53-1,
p. 23).  Additionally, the investigator must "[i]dentify and provide examples of the
two different types of dynamics and their effects."  (Doc. 53-1, p. 23).

Agent Williams did not reference principles of physics or kinetic energy in
his investigative report or affidavit, and it is unclear whether he considered these
principles in his investigation.  (Doc. 13-5); (Doc. 51-3, pp. 1–4). The NASBLA
standards also call on investigators to "[k]now the concept of occupant kinematics
and Newton's Laws" and how they "will affect an occupant in a boating collision . .
. ." (Doc. 53-1, p. 26).  Despite this guidance, Agent Williams's deposition testimony
regarding these concepts is vague and imprecise. *See, e.g.*, (Doc. 17-2, p. 27, tpp.
102–04).

Accordingly, because Ms. Stewart-Magee has not demonstrated how Agent
Williams's experience, education, and training inform his opinion regarding the Sea-
Doo's angle of impact with the dock and his conclusion, based on that abandoned
angle guesstimate, that Mr. Snyder was driving and was ejected over the handlebar
and onto the dock, the Court will exclude Agent Williams's opinion in this regard.

Ms. Stewart-Magee argues that Officer Williams's testimony regarding the nature and location of Mr. Snyder's injuries support his opinion that Mr. Snyder was driving the Sea-Doo at the time of the accident.  Agent Williams testified that Mr. Snyder had "bruising along [his] right hip and extending into his anterior upper right thigh consistent with bruising that would be caused by an impact to the steering mechanism of the SeaDoo."  (Doc. 13-5, p. 5, ¶ 13); (Doc. 17-1, p. 14, tp. 48; p. 18, tp. 64).  In Agent Williams's experience, "a lot of times bruising coming through the abdominal portion of the body" results from contact with the handlebar of personal watercraft like the SeaDoo.  (Doc. 17-1, p. 14, tp. 48).

According to Agent Williams, Mr. Snyder "[c]ame in contact with from end to end of the handle grips and everything in between." (Doc. 17-2, p. 24, tp. 92). Agent Williams did not measure the Sea-Doo's handlebar or do a size comparison between the handlebar and the bruises on Mr. Snyder's body.  (Doc. 17-2, p. 14. tp. 52); (Doc. 54, p. 68); (Docs. 59-13, 59-19).  Agent Williams testified that even if the handlebar was turned to the left at the time of impact, Mr. Snyder still would have contacted the entire steering mechanism:

> Q.   Okay. But at the point of impact the handlebars would have been turned to the left, correct?
>
> A.   Correct.
>
> Q.   And would he have still been able to come in contact with the entirety of the handlebars turned to the left like that?
>
> A.   Absolutely.

> Q.    How would that work?
>
> A.    It is motion.
>
> Q.    If the handlebars are turned to the left and he is coming straight off the Sea-Doo, which part of the handlebar would he come in contact with first?
>
> A.    He'd still come in contact with all of it. He is right up against it.

(Doc. 17-2, pp. 24–25, tpp. 92–93).

At the *Daubert* hearing, Mr. Snyder's attorney asked Agent Williams if he would agree "that if the handlebars are being turned at a hard left-hand turn, then the handlebar that is closest to the driver is on the left side." (Doc. 54, p. 141). Agent Williams agreed, and the following conversation ensued:

> Q.    And where the big, red roadrash is is on the side that's the farthest away from the handlebars, correct?
>
> A.    Correct.
>
> Q.    But you still think that somehow that's how Mr. Snyder got that mark on the right side of his body?
>
> A.    Through the handlebars.
>
> Q.    From the left-hand turn?
>
> A.    Right.
>
> Q.    Did you do anything to measure out how far away that would be and whether he would actually go straight ahead and hit the handlebars after the thing was turned left?
>
> A.    He's sitting right in front of the handlebars. It's not going to be a couple of inches. It depends on how close he likes to be to the handlebars.

(Doc. 54, pp. 141–42); (Doc. 59-19).

The Court has not located evidence in the record that establishes the distance between Mr. Snyder's body and the handlebar if Mr. Snyder was sitting in the front seat of the SeaDoo.  The Court cannot evaluate the reliability of Agent Williams's statement that "motion" caused Mr. Snyder's body to come into contact with the entire handlebar.  Because the bruising on Mr. Snyder's body was predominant to his right side, (Doc. 59-19), it is unclear how Mr. Snyder's entire abdominal area would have come in contact with the handlebar but bruised only the right side.[5] Where the physical evidence and bruising on Mr. Snyder's body are inconsistent with Agent Williams's theory, Agent Williams must be able to articulate the basis for his theory for the Court to assess its reliability.  The Court cannot simply take Agent Williams's word for it.

In addition to bruising to his right front hip area, Mr. Snyder also had bruising along his right side that wrapped around his right buttocks area.  (Doc. 54, p. 64); (Doc. 51-11).  In 2019, Agent Williams testified that it was his "opinion and belief" that the bruising was caused by "contact with the decking of the dock."  (Doc. 17-2, pp. 24–25, tpp. 93–94).  When asked if the bruising was caused by the Sea-Doo's handlebar, Agent Williams answered:  "[n]ot to my knowledge."  (Doc. 17-2, pp. 24–25, tpp. 93–94).

At the February 15, 2023, *Daubert* hearing, Agent Williams testified again

---

[5] (Doc. 17-2 p. 25, tp. 96); (Doc. 46-2); (Doc. 51-6, p. 2); (Doc. 51-11); (Doc. 54, p. 65).

asked about the cause of the bruising on the right side of Mr. Snyder's body.  This time, Agent Williams testified that the bruising was caused by both impact with the dock and with the Sea-Doo's handlebar.  (Doc. 54, p. 79).  Agent Williams's contradictory testimony about the cause of the bruising on the side of Mr. Snyder's body renders his testimony unreliable.

Agent Williams also cannot explain, using reliable scientific principles, how – if Mr. Snyder was in the driver position, the Sea-Doo hit the dock at some angle, and Mr. Snyder went straight over the SeaDoo's steering mechanism – Mr. Snyder's body twisted as he was airborne and contacted the dock on his right side to sustain a road rash-like injury.  (Doc. 54, pp. 81-82, 142).  His testimony is unreliable because it "unjustifiably extrapolate[s] from an accepted premise to an unfounded conclusion." *Frazier*, 387 F.3d at 1297 n.13 (internal quotations and citation omitted).  Agent Williams cannot recall a case in which he identified the driver of a personal watercraft by looking at a person's injuries, and he has not provided examples of other cases where bruising like Mr. Snyder's was consistent with hitting the steering mechanism.  (Doc. 17-2, p. p. tp. 31–32); (Doc. 54, p. 52).

Injury causation analysis typically involves consideration of alternative causes of an injury.  "Although a reliable differential diagnosis need not rule out all possible alternative causes, it must at least consider other factors that could have been the sole cause of the plaintiff's injury . . . . [A] 'differential diagnosis that fails

to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation.'" *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999)).

Agent Williams testified that bruising on the legs is consistent with hitting the Sea-Doo's steering mechanism.  (Doc. 17-2, p. 9, tp. 29).  Ms. Sharifullina had bruising on her legs and feet.  (Doc. 46-4); (Docs. 51-8, 51-9, 51-12, 51-13); (Doc. 54, pp. 71–74).   Agent Williams has not explained what analysis, if any, he undertook to rule out the possibility that Ms. Sharifullina was driving the Sea-Doo and hit the steering mechanism upon ejection from the PWC.  Agent Williams's testified that Mr. Snyder's injuries "were to the lower part" and that "Ms. Albina did not have any of those consistently. Only thing that she had consistently was the head injury." (Doc. 17-2, p. 26, tp. 99).

At the *Daubert* hearing, when Mr. Snyder's attorney tested Agent Williams's focus on the injury to Ms. Sharifullina's head to the exclusion of other injuries, Agent Williams had no reliable explanation for discounting the injuries to Ms. Sharifullina's legs.  Agent Williams testified:

> Q.  What did you do to match up all these bruises on Ms. Sharifullina's legs?
>
> A.  Between the guy-wire that was in the water that connects the dock to the equalizer and the walkway, consistent with the pole, the pole that was going across, and like I said, the wire in the water.

Q. Just to be clear, you have opined that it was her head that hit the pole?

A. Correct.

Q. Not her legs?

A.  Correct.

Q. So are you saying that all of the injuries to her legs were caused by the guy-wire?

A. It could have been. Could have been the guy-wire and as she is coming across the pole as well.

Q. You don't know one way for sure, one way or the other?

A. I'm not -- she went across the poles, is what we're coming up with.

Q. Did you compare the patterning in the pole to the bruises on her legs?

A. Did I -- what is your question?

Q. Any metal surface has a texture, doesn't it?

A. Right.

Q. Did you compare that to the bruising on her legs?

A.  I  did  not  come  up  with  anything  defining,  that  I recall.

Q. Did you even do that?

A.  I don't recall that.

Q. Did you do that with the guy-wire?

A. I don't recall.

(Doc. 54, pp. 74-75).

Agent Williams testified that when she was ejected from the rear seat of the Sea-Doo, Ms. Sharifullina hit her head on a metal horizontal support beam on the dock and bent the metal pole.  (Doc. 54, pp. 75, 84–85); (Docs. 59-10, 59-18).  Mr. Snyder's attorney asked Agent Williams if he did "anything to analyze how much weight it would take to create a deflection like that" on the beam:

> Q.   Did you do anything to analyze the likelihood of that horizontal beam being bent like that based on Ms. Sharifullina's weight?
>
> A.   No.
>
> Q.   Is it even possible for someone of her weight to bend that, do you know?
>
> A.   It's possible.
>
> Q.   But did you do anything to confirm that?
>
> A.   No.

(Doc. 54, pp. 84–85).  Agent Williams has not explained how his education or training informed his opinion, and there is no evidence that Agent Williams considered whether Mr. Snyder, as the rear passenger on the Sea-Doo, may have been ejected and struck the beam.

NASBLA's standards call on investigators to apply a "systematic approach to collision investigations" by, for example, "establish[ing] a scenario that fits well with all damage and evidence analyzed."  (Doc. 53-1, p. 26).  The investigator must apply "deductive reasoning" and the systematic approach "to establish a logical

21

collision scenario . . . prior to theorizing a probable conclusion." (Doc. 53-1, p. 26). The investigator must "[a]ssess all damage, evidence, and the information provided in a case study in order to test the validity of all witness statements and to arrive at the most logical conclusion." (Doc. 53-1, p. 28).

Agent Williams's testimony does not demonstrate that he followed NASBLA's guidance during his investigation. Agent Williams's opinion that Mr. Snyder was driving the Sea-Doo at the time of the accident and went directly over the handlebar upon impact is based on Mr. Snyder's injuries, but Agent Williams has not explained whether he ruled out other possible causes of Mr. Snyder's injuries. Additionally, Agent Williams's theory that Mr. Snyder's body contacted the entire handlebar does not "establish a scenario that fits well with all damage and evidence analyzed," (Doc. 53-1, p. 26), or "account for obvious alternative explanations," *Frazier*, 387 F.3d at 1297 n.13.[6]

---

[6] *See, e.g.*, *Abbott*, 2023 WL 2640203, at *5 ("Trooper Wallace's methods for opining on causation and fault are not reliable. What stands out is what he does not know. Trooper Wallace testified that he does not know how fast Mr. Abbott was traveling. He does not know the distance between Mr. Morgan's tractor-trailer and Mr. Abbott's tractor-trailer when Mr. Morgan turned, and he did not measure the distances at the scene. He does not know at what point Mr. Abbott used his brakes. And he took no notes on measurements of any marks on the roadway or their distance from the intersection where Mr. Morgan turned left (or noted if there were no marks). While Trooper Wallace does opine that the gouge marks and other markings at the scene were caused by the impact of the tractor-trailers, and not by braking, he does not explain how he reached this conclusion. There is no data, testing, or facts to support his opinions on fault and causation, and he fails to explain how his experience leads him to the conclusion he makes. The analytical gap between the facts and opinions is too wide to find Trooper Wallace's opinions reliable . . . . Plaintiffs cite no page of Trooper Wallace's deposition that discusses Trooper Wallace's methods for why the information gathered at the scene led to the conclusions he reached . . . . [T]he foundation of Trooper Wallace's opinion appears to be that because Mr. Abbott had the right-of-

Accordingly, Agent Williams's opinion about the cause of Mr. Snyder's injuries and his extrapolation from the injuries that Mr. Snyder was driving the Sea-Doo at the time of the accident is unreliable.   The Court will exclude Agent Williams's opinion in this regard.

For the reasons stated in this opinion, the Court grants Mr. Snyder's motion to exclude Agent Williams's expert opinions at trial.   Agent Williams may testify about his investigation and the facts and evidence gathered, but Agent Williams's opinion testimony is inadmissible as are his guesstimates about angles of impact and other unscientific conclusions discussed in this opinion.   At trial, Agent Williams may not opine that Mr. Snyder was operating the Sea-Doo on the night of the accident.

---

way, the accident had to be Mr. Morgan's fault.  A jury very well might make that finding, but Plaintiffs have not shown that Trooper Wallace's opinions are based on a reliable method.") (internal citations omitted); *Kelly v. Carnival Corp.*, 2022 WL 873795, at *7–8 (S.D. Fla. Mar. 23, 2022) ("Mr. Jaques's opinions in this case appear to be premised almost entirely upon his experience and his observations or inferences derived from watching a YouTube video of what he believes to be a similar stateroom, Plaintiff's photographs of her stateroom, and his interviews with the Plaintiff and her son, with no clear explanation of any connection between his experiences and his ultimate opinions . . . . Mr. Jaques's opinions do not satisfy the reliability requirement of *Daubert* because they lack any proper methodological foundation."); *Serrano v. Am. Airlines, Inc.*, 2016 WL 6600499, at *2 (S.D. Fla. Nov. 8, 2016) ("[T]hough Getty asserts he used the scientific method and deductive reasoning in general to analyze Serrano's fall, he did not perform any testing or consult relevant publications to reach his conclusions. Instead, he used his engineering knowledge and mobile stairway experiences to offer three possible reasons for a lifted step, which illustrates how speculative his opinion is.").

**DONE** and **ORDERED** this May 27, 2023.

MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE